Carrie BADON; Ray Badon; Russell Badon; Joe Mae Badon–Roberson; Scotty Joseph Badon, Plaintiffs–Appellants,

v.

R J R NABISCO INC.; Liggett & Meyers Tobacco Co.; American Brands Inc.; Philip Morris Companies Inc.; B A T Industries, Ltd.; Pelican Cigar Co.; Malone & Hyde, Inc.; Schlesinger Wholesalers & Automotive Cigarette Service, Inc.; Philip Morris Inc.; R J Reynolds Tobacco Co.; Brown & Williamson Tobacco Co.; Batus Holdings Inc.; American Tobacco Co.; Liggett Group Inc.; Brooke Group Limited; Hill & Knowlton Inc.; Tobacco Industry Research Committee; Council For Tobacco Research USA Inc.; Tobacco Institute Inc.; Fortune Brands Inc.; Liggett & Myers Inc., Defendants–Appellees.

No. 98–30942.

United States Court of Appeals, Fifth Circuit.

Aug. 16, 2000.

---

7. *Haywood v. Sullivan,* 888 F.2d 1463 (5th    Cir.1989).

David H. Nelson, Theus, Grisham, Davis & Leigh, Monroe. LA, for Council for Tobacco Research USA, Inc.

Alan H. Goodman, Thomas Mente Benjamin, Lemle & Kelleher, New Orleans, LA, for The Tobacco Institute, Inc.

Kenneth E. Badon (argued), Drew A. Ranier, Badon & Ranier, Lake Charles, LA, for Plaintiffs–Appellants.

James R. Nieset, Plauche, Smith & Nieset, Lake Charles, LA, Theodore Martin Grossman, Mark A. Belasic, Dennis Leo Murphy, Jones, Day, Reavis & Pogue, Cleveland, OH, for RJR Nabisco Inc. and RJ Reynolds Tobacco Co.

Patrick A. Juneau, Jr., Barry Louis Domingue, The Juneau Firm, Lafayette, LA, Deborah B. Rouen, Robert N. Markle, Jeffrey Edward Richardson, Scott Edward Delacroix, Charles F. Gay, Jr. (argued), Adams & Reese, New Orleans, LA, for Philip Morris Companies, Inc. and Philip Morris, Inc.

Lloyd N. Shields, Daniel Lund, III, Shields, Mott & Lund, New Orleans, LA, for BAT Industries, Ltd.

John E. McElligott, Jr., Davidson, Meaux, Sonnier, McElligott & Swift, Lafayette, LA, for Pelican Cigar Co., Malone & Hyde Inc. and Schlesinger Wholesalers & Automotive Cigarette Serv., Inc.

Carmelite M. Bertaut, William F. Grace, Jr., Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, William L. Durham, II, King & Spalding, Atlanta, GA, for Brown & Williamson Tobacco Corp., Batus Holdings Inc., American Tobacco Co and Fortune Brands Inc.

Ellen Beth Malow, Kasowitz, Benson, Torres & Friedman, Houston, TX, Madeleine M. Fischer, Jones, Walker, Waechter, Poitevent, Carrier & Denegre, New Orleans, LA, for Liggett Group Inc., Brooke Group Ltd. and Liggett & Myers Inc.

Before KING, Chief Judge, and GARWOOD and STEWART, Circuit Judges.

GARWOOD, Circuit Judge:

The instant interlocutory appeal concerns the propriety of the district court's denial of the plaintiffs' motion to remand this tobacco case to the Louisiana court from which defendants had removed it on the basis of diversity of citizenship, alleging that all the nondiverse defendants were fraudulently joined. The district court certified its denial of the motion to remand under 28 U.S.C. § 1292(b) and we then granted plaintiffs' petition to appeal.

### Facts and Proceedings Below

This action by plaintiff Carrie Badon, and other parties Badon, all Louisiana residents, seeks relief from numerous cigarette manufacturers, three wholesalers or distributors, and others, all on account of Carrie Badon having incurred throat cancer, which was diagnosed in May 1993, as a result of having smoked cigarettes manufactured and sold by defendants. It is alleged that Badon, whom the record reflects was born in October 1937, smoked cigarettes "for approximately 40 years," and as a result "became addicted to them."

The original complaint was filed in Louisiana state court on May 23, 1994. It named as defendants five cigarette manufacturers, each a foreign (i.e., non-Louisiana) corporation, and three "cigarette distributors," two of the latter, Pelican Cigar Company (Pelican) and Schlesinger Wholesalers and Automatic Cigarette Service,

Inc. (Schlesinger), being Louisiana corporations.[1] Pursuant to the directions of plaintiffs' counsel, process was not served on any of the defendants nor were any of them notified of the suit until after the amended complaint was filed on December 30, 1997.[2] The first time any defendant had any notice of the suit was on January 5, 1998, when service, of the original and amended complaints, was made on the first defendant to be served. The amended complaint—fifty-seven legal pages long and divided into numbered paragraphs 18 (the last numbered paragraph of the original complaint was number 17) through 236—names the same defendants as the original complaint and adds as defendants several corporations which are parents or affiliates of the cigarette manufacturer defendants originally named, and also adds as defendants a public relations corporation (which, just following removal, plaintiffs dismissed without prejudice) and two incorporated trade organizations.[3] All defendants are foreign corporations, except the two Louisiana distributors who are referred to in the amended complaint as "the Tobacco Wholesalers". The amended complaint alleges that "the Tobacco Wholesalers were authorized retail and/or wholesale distributors, sellers, and/or dealers of and on behalf of the Tobacco companies" (defined to mean the defendants manufacturers and their parent and affiliate corporations). Neither the original nor the amended complaint alleges that Carrie Badon (or any other plaintiff) ever acquired any cigarettes directly from any of the Louisiana distributor defendants, but it is alleged that she smoked cigarettes which those defendants had distributed.

1. It was established below and is undisputed that one of the three distributors, Malone And Hyde, Inc., though initially alleged to be a Louisiana corporation, was in fact at all relevant times a Delaware corporation with its principal place of business in Tennessee, that its corporate existence ceased in December 1994 by virtue of its having merged into Fleming Corporation Inc., an Oklahoma corporation with its principal place of business in Oklahoma. We take no further notice of Malone And Hyde, Inc.

2. Under Louisiana law a civil action is commenced by filing the complaint. La.Code Civ. Proc., art. 421. Until recently, there was no requirement that citation issue or any other action be taken in the suit within a specified time of filing except that an action was deemed "abandoned" if no steps were taken in its prosecution for five years. Id., art. 561A(1). In 1997 art. 561(A)(1) was amended so that its five year period was changed to three years, effective July 1, 1998; and, provisions were added requiring request for citation within 90 days, id., art. 1201(c), and authorizing dismissal for failure to do so, id., art. 1672c, each stated to be "applicable only to suits filed on and after" the effective date of the amendatory act, namely January 1, 1998. In an affidavit filed below, plaintiffs' counsel stated that in May 1994 he was aware of the suit filed by the Mississippi attorney general against tobacco companies, settlement of which was subsequently announced in June 1997, as well as "being aware of other events surrounding the tobacco industry, such as 'whistle-blowers', congressional hearings and class-action lawsuits," and that in the instant case service of process was withheld "to take advantage of the anticipated discovery process, specifically including the document production, that was certain to occur in other venues" (without, however, stating any explanation of why or how withholding of citation was necessary or helpful for such purpose) and "not ... for the purpose of manipulating or avoiding removed jurisdiction," and that process was finally issued because of the above mentioned 1997 amendments to the Louisiana Code of Civil Procedure "to avoid any argument that the present action should be dismissed for want of prosecution or failure to make timely service of process."

3. The amended complaint also says that it makes as defendants " 'A' through 'Z' Entities (DOE Defendants)"; none of these are ever named (nor ever served); it is alleged that their "identities are presently unknown;" none are described and no specifics are alleged concerning any of them or what any did or did not do, nor is anything alleged respecting the citizenship or residence of any of them, and it is evident that they are entirely hypothetical as opposed to being one or more specific persons or entities whose names and/or present whereabouts or the like are simply not known. Cf. 28 U.S.C. § 1441(a) ("For purposes of removal under this chapter, the citizenship of defendants sued under fictitious names shall be disregarded").

For example, the amended complaint alleges that "Defendants were engaged in the business of manufacturing and/or selling their tobacco products for ultimate retail sale to consumers such as Plaintiff. Defendants manufactured their tobacco products, manipulated the level of nicotine in their tobacco products and sold these tobacco products to retailers, who sold the Defendants' tobacco products to Plaintiff."

On February 4, 1998, defendants filed their joint notice of removal relying on diversity of citizenship and asserting that all defendants except the two Louisiana distributors were diverse to all the plaintiffs and that the citizenship of the Louisiana distributors should be disregarded as they were fraudulently joined in that there was no possibility of recovery against them. In the latter connection, it was alleged, *inter alia*, that they were not manufacturers, were mere distributors, sold only in the original sealed containers, and had no greater knowledge of the composition or properties of cigarettes than the consuming public, and reliance was placed on, among others, the decisions in *Lonkowski v. RJ Reynolds Tobacco Co.*, 1996 WL 888182, No. 96–1192 (W.D.La. December 10, 1996) (Trimble, J.); *Vickrey v. RJ Reynolds Tobacco Co.*, No. 96–2612 (W.D.La. April 3, 1997) (Little, C.J.); and *Morgan v. United States Tobacco Co.*, No. 97–0280 (W.D. La. April 12, 1997) (Little, C.J.).

On March 6, 1998, plaintiffs filed their motion to remand. They did not question that there was the requisite amount in controversy and, except for the distributor defendants, complete diversity. They asserted first that the removal was untimely under the concluding clause of the second paragraph of 28 U.S.C. § 1446(b), stating that "a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action," in that the action had been commenced in May 1994 and removal was not attempted until February 1998. Plaintiffs also alleged that

their joinder of the Louisiana distributors was not fraudulent in that they could recover against them on the basis of redhibition, under La. Civ.Code arts. 2520, 2524 (in their discussion of article 2524 plaintiffs also relied on La. Civ.Code art. 2475) and 2531, and also on the basis of conspiracy under La. Civ.Code art. 2324. In respect to conspiracy, the motion to remand states that a conspiracy has been alleged against all defendants in paragraphs 19, 48 and 49 of the amended complaint which it quotes and then characterizes as having "alleged an agreement between *all* of the Defendants to manipulate nicotine in cigarettes with the intent to addict Carrie Badon to tobacco products and thereby causing her to suffer great harm." The motion to remand was unverified and was supported by (and only by) the affidavit of plaintiffs' counsel stating why service of process on the original complaint had been withheld (see note 2 *supra*).

On March 24, 1998, defendants filed their opposition to the motion to remand. They contended that removal was timely as it was effected within thirty days of receipt of the initial pleading in the case as provided in the first paragraph of section 1446(b), and that the second paragraph of section 1446(b) was inapplicable because the case was removable as initially filed. They also alleged that plaintiffs' inequitable conduct in withholding citation for more than three years and seven months precluded their reliance on the one year limitation contained in the second paragraph of section 1446(b). As to diversity jurisdiction, defendants reiterated that there was complete diversity except for the two Louisiana distributor defendants and urged that the citizenship of those defendants should be disregarded as they had been fraudulently joined in that plaintiffs had no claim against them under Louisiana law. The opposition to the motion to remand was supported by affidavits of the two Louisiana distributors denying the allegations of conspiracy, and averring that they "at no time ... entered into any

agreement with anyone, including any manufacturer of tobacco products or any Defendants ... for the concealment or suppression of information regarding the nicotine levels in cigarettes, the alleged regulation of nicotine levels in tobacco products, or nicotine 'addiction' ", and that they "have never met with, discussed, written to or received written or oral communications or otherwise planned with any of the tobacco manufacturers or any other defendants to take any of the unlawful acts alleged." These affidavits also averred that the distributors never designed, manufactured, packaged or labeled cigarettes or purchased or blended tobacco for cigarettes, never held themselves out as manufacturers of cigarettes, never exercised or attempted to exercise any control or influence over any characteristics of the design, composition, or quality of cigarettes, never made any representations concerning health risks associated with smoking or the alleged addictiveness of nicotine, never had (and never represented to the public or to any plaintiff that they had) any specialized or superior knowledge not available to the general public respecting nicotine levels in cigarettes or nicotine addiction or health risks associated with smoking, and that all the cigarettes they sold were sold unaltered in the labeled and sealed packages in which they were received from the manufacturers.[4]

4. The affidavit of the Pelican president, for example, includes the following:

"At no time has PELICAN CIGAR COMPANY engaged in or otherwise been involved in purchasing or blending tobacco for use in cigarettes; designing cigarettes; manufacturing cigarettes; or packaging or labeling cigarettes.

At no time has PELICAN CIGAR COMPANY labeled, packaged or advertised cigarettes as its own product, or otherwise held itself out to the public as the manufacturer of cigarettes.

At no time has PELICAN CIGAR COMPANY exercised or attempted to exercise any control or influence over any characteristic of the design, composition or quality of cigarettes.

PELICAN CIGAR COMPANY purchases all cigarettes it sells in sealed packages, which have been labeled and packaged by the manufacturer, and resells such products in the same sealed packages without altering in any manner the contents thereof.

PELICAN CIGAR COMPANY does not incorporate any of the cigarettes it purchases into any other products it sells or markets.

PELICAN CIGAR COMPANY has never exercised any control over the activities of any manufacturer of cigarettes; in addition no manufacturers of cigarettes has ever had an ownership interest in or exercised control over the activities of PELICAN CIGAR COMPANY.

PELICAN CIGAR COMPANY has never had any information from any source concerning the nicotine levels in cigarettes, or the health risks alleged to be associated with smoking (with the exception of the information, if any, that might be pre-printed on the tobacco product packages or contained in tobacco product manufacturers' advertisements), the alleged regulation or alleged manipulation of nicotine levels in cigarettes, or nicotine 'addiction,' except information reported in the popular press-such as television broadcasts, newspapers and magazines.

PELICAN CIGAR COMPANY does not have, and never has had, any specialized or superior knowledge that was not available to the general public relating to nicotine levels in cigarettes, the alleged regulation or alleged manipulation of nicotine levels in cigarettes, or nicotine 'addiction,' the health risks alleged to be associated with smoking, and has never represented, stated or averred to any member of the general public, including plaintiffs, that it, or any of its agents or employees, possesses any such specialized or superior knowledge.

PELICAN CIGAR COMPANY has never made any representations concerning the health risks alleged to be associated with smoking, or the alleged 'addictiveness' of nicotine.

At no time has PELICAN CIGAR COMPANY entered into any agreement with anyone, including any manufacturer of tobacco products or any Defendants in this case, for the concealment or suppression of information regarding the nicotine levels in cigarettes, the alleged regulation of nicotine levels in tobacco products, or nicotine 'addiction.'

I have reviewed the allegations of conspiracy made in Paragraphs 19, 48 and 49 of Plaintiffs' Petition in this lawsuit, as amended. These allegations appear to have been drafted solely with reference to cigarette manufacturers, not distributor of cigarettes.

On March 31, 1998, plaintiffs filed their unverified reply to defendants' opposition to the motion to remand. This reply asserts only that the removal was untimely under the one year clause of the second paragraph of section 1446(b) and that there was no fraudulent joinder of the Louisiana distributor defendants because recovery against them under the Louisiana law of redhibition and/or warranty was possible even though there was no privity between them and plaintiffs.[5] This reply contains no mention of the conspiracy claim, and it does not contain any reference to the mentioned affidavits of the distributors or any denial of or statement inconsistent with any of the averments in those affidavits. No affidavits or other summary judgment type evidence was filed or tendered by plaintiffs with or in support of their said reply or their motion to remand.[6] Nor at any time did plaintiffs seek any delay in ruling on the motion to remand in order to produce or discover evidence in support of the motion or to rebut the opposition to it.

The district court denied the motion to remand in an April 17, 1998 memorandum ruling. The court held that the removal was timely because the one year removal limit stated in section 1446(b) applied only to the second paragraph of section 1446(b) and in this case timeliness of removal was governed by the first paragraph of section 1446(b) because the case initially filed in May 1994 was removable.

Alternatively, citing *Kinabrew v. Emco–Wheaton, Inc.,* 936 F.Supp. 351 (M.D.La. 1996), the court held that by deliberately withholding citation for more than three and a half years plaintiffs waived the one year limit of section 1446(b), even if it were otherwise applicable. The district court next held that the Louisiana distributors were fraudulently joined, applying the "summary judgment-like" methodology which our decisions have approved for deciding such issues. *See, e.g., Burchett v. Cargill,* 48 F.3d 173, 176 (5th Cir.1995). The court noted that the only bases of recovery plaintiffs had asserted against the Louisiana distributors were conspiracy, redhibition and breach of the warranty of fitness. As to the conspiracy claim, the court concluded that on the basis of the distributors' affidavits and "in light of the plaintiffs' lack of evidence" there was no reasonable possibility of recovery against the distributors. As to the redhibition and breach of warranty claims the court likewise concluded there was no reasonable possibility of recovery against the Louisiana distributors. The court noted that the asserted defect in the cigarettes was not redhibitory or within article 2475 as the cigarettes were not claimed to have had "the type of functional failure that is characteristic of a redhibitory defect," or "of a breach of warranty of reasonable fitness for intended use," and that La. Civ.Code art. 2521 barred

---

Nevertheless, to the extent that the allegations in these paragraphs are in any way directed against PELICAN CIGAR COMPANY, they are unfounded. We have never met with, discussed, written to or received written or oral communications or otherwise planned with any of the tobacco manufacturers or any other defendants to take any of the unlawful acts alleged in the Petition."

5. The reply in this connection states that:
"In Louisiana, certain distributors have been held liable for breach of the warranty of fitness. *See Media Production Consultants, Inc. v. Mercedes–Benz of N. America, Inc.,* 262 La. 80, 262 So.2d 377, 381 (1972). The *Media Production* court held that an

automobile buyer could recover under the warranty of fitness from the automobile distributor. *Id.* The court concluded that notwithstanding the absence of privity between it and the consumer, the distributor occupied the position of manufacturer and thus incurred the same liability as a manufacturer....In the present case, it is plausible that as major state distributors of cigarettes in Louisiana, the non-diverse 'distributors' could be considered 'manufacturers' under the *Media Production* test given their major role in the distribution of cigarettes in Louisiana."

6. Except for the affidavit of plaintiffs' counsel referred in note 2 above. Neither the original nor the amended complaint is verified.

recovery because the dangers of smoking tobacco products should have been discovered by a reasonably prudent buyer. The court likewise concluded that the cigarettes were fit to be used for their intended use of smoking and that the distributors here did not have a relationship to the consumer and manufacturers which was analogous to that of the distributor defendant in *Media Production Consultants, Inc. v. Mercedes–Benz of North America*, 262 La. 80, 262 So.2d 377 (1972). The court accordingly concluded that the Louisiana distributors were fraudulently joined, and denied the motion to remand.

Plaintiffs did not seek reconsideration of the district court's order denying remand, but on May 8, 1998 did move the Court to certify the matter for interlocutory appeal, asserting that the questions of whether removal was timely and "whether Louisiana redhibition laws apply to tobacco products" (or whether there could be "recovery, under Louisiana law, against distributors for damages caused by use of tobacco products") were controlling questions of law as to which there was substantial ground for difference of opinion. The motion to certify makes no mention of the conspiracy claim. By order of May 19, 1998, the district court granted plaintiffs' motion to certify and certified its order of April 17 denying the motion to remand.

## Discussion

In their appeal, plaintiffs contend removal was untimely under section 1446(b)'s one year limit for diversity cases because it was not affected within one year from when the suit was filed in May 1994. They also claim that the Louisiana distributors were not fraudulently joined because they asserted possible Louisiana law claims against them based on conspiracy,

redhibition and breach of implied warranty under article 2475.

We address these claims in turn.

*Timeliness of Removal*

Timeliness of removal in a civil case is governed by section 1446(b) which provides:

"(b) The notice of removal of a civil action or proceeding shall be filed within thirty days after the receipt by the defendant, through service or otherwise, of a copy of the initial pleading setting forth the claim for relief upon which such action or proceeding is based, or within thirty days after the service of summons upon the defendant if such initial pleading has then been filed in court and is not required to be served on the defendant, whichever period is shorter.

If the case stated by the initial pleading is not removable, a notice of removal may be filed within thirty days after receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable, except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action."

Plaintiffs rely on the "except" clause at the end of the second paragraph of section 1446(b), contending that as removal was sought only on the basis of diversity of citizenship under 28 U.S.C. § 1332 it was untimely since the suit was commenced in May 1994 and the notice of removal was not filed until February 4, 1998, more than one year thereafter.

In 1988 section 1446(b) was amended by adding the "except" clause at the end of its second paragraph. Pub.L. 100–702, § 1016(b)(2), 102 Stat. 4669 (Nov. 19, 1988).[7] Apart from the 1988 amendment

---

**7.** Section 1016 of Pub.L. 100–702 amended § 1446(b) as follows:

"(b) Procedure for Removal.—Section 1446 is amended—

adding the "except clause" (and substituting "notice of removal" for "petition for removal"), and a 1965 substitution of "thirty days" for "twenty days",[8] the present language of section 1446(b) has been unchanged since it was substantially rewritten in 1949.[9]

■ We have clearly held that the "except" clause applies only to cases governed by the second paragraph of section 1446(b), "i.e. only to cases that are not initially removable." *New York Life Ins. Co. v. Deshotel,* 142 F.3d 873, 886 (5th Cir.1998). Accord, *Brierly v. Alusuisse Flexible Packaging, Inc.,* 170 F.3d 583, 590 (6th Cir.1999) ("the one-year limitation on removal of diversity cases applies only to those that were not initially removable"); *Ritchey v. Upjohn Drug Co.,* 139 F.3d 1313, 1316 (9th Cir.), *cert. denied,* 525 U.S. 963, 119 S.Ct. 407, 142 L.Ed.2d 330 (1998) ("The first paragraph of § 1446(b) addresses a defendant's right to promptly remove when he is served. The second paragraph addresses a defendant's right to remove beyond the initial period of 30 days, if the case only became removable sometime after the initial commencement of the action. Only the latter type of

removal is barred by the one-year exception").

■ Plaintiffs argue that because removal was predicated on fraudulent joinder and depended on piercing their pleadings that therefore the case was not initially removable and is accordingly governed by the second paragraph of section 1446(b). We reject this contention. Ever since a time many years prior to 1988 we have consistently recognized that diversity removal may be based on evidence outside the pleadings to establish that the plaintiff has no possibility of recovery on the claim or claims asserted against the named resident defendant and that hence such defendant is fraudulently joined and his citizenship must be disregarded for jurisdictional purpose. *See, e.g., Keating v. Shell Chemical Co.,* 610 F.2d 328, 333 (5th Cir.1980); *Burden v. General Dynamics Corp.,* 60 F.3d 213, 217 (5th Cir.1995).[10] *See also, e.g., LeJeune v. Shell Oil Co.,* 950 F.2d 267, 271 (5th Cir.1992) ("In this circuit, a removing party's claim of fraudulent joinder to destroy diversify is viewed as similar to a motion for summary judgment.... A court is to pierce the pleadings to determine whether, under controlling state

---

(1) by amending subsection (a) to read as follows:
...;
(2) in subsection (b)—
(A) by striking out 'petition for removal' each place it appears and inserting in lieu thereof 'notice of removal'; and
(B) in the second paragraph by striking out the period at the end thereof and inserting in lieu thereof ", except that a case may not be removed on the basis of jurisdiction conferred by section 1332 of this title more than 1 year after commencement of the action';
..."

8. Pub.L. 89–215, 79 Stat. 887 (September 29, 1965).

9. C. 139, Pub.L. 72, § 83, 63 Stat. 101 (May 24, 1949). The 1949 amendment made technical changes to the single sentence which constituted § 1446(b) as it appeared in the 1948 Judicial Code (June 25, 1948, C. 646, Pub.L. 773, 62 Stat. 939) and added to § 1446(b) the second paragraph, which the

legislative history indicates was thought to be declaratory of existing decisional law. See S.Rep. No. 303 (1949), reprinted in 1949 U.S.C.C.A.N. 1248 at 1268.

10. We stated in *Burden,* "Our decisions subsequent to *B.Inc. [v. Miller Brewing Co.,* 663 F.2d 545 (5th Cir.1981)] have consistently maintained that a district court may look to evidence *outside of the pleadings* in determining a fraudulent joinder claim.... Lest there remain even a shadow of a doubt as to this circuit's position, we reiterate-in hopes that further pronouncement will not be necessary-that in testing for fraudulent joinder the district court in its discretion may 'pierce the pleadings' .... [fraudulent joinder is established if the summary judgment type evidence demonstrates that] 'as a matter of law, there [is] no reasonable basis for predicting that the plaintiff might establish liability against a named in-state defendant in state court.'" *Id.* (footnote omitted).

law, the non-removing party has a valid claim against the non-diverse parties"); *Carriere v. Sears, Roebuck and Co.*, 893 F.2d 98, 100 (5th Cir.), *cert. denied*, 498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990) ("When determining fraudulent joinder, the district court may look to the facts as established by summary judgment evidence as well as the controlling state law").[11] Thus it is clear that although a state court complaint on its face may allege a state law claim against an in-state defendant that does not preclude it from being removable (by the non-resident defendant), when filed, if the plaintiff's pleading is pierced and it is shown that as a matter of law there is no reasonable basis for predicting that the plaintiff might establish liability on that claim against the in-state defendant.

Moreover, plaintiffs' argument in this respect ignores the fact that section 1446(b) is concerned only with the *timing* of removal, and not at all with *what* must be shown in order to remove or *how* that showing may or must be made. The first paragraph of section 1446(b) sets forth the general rule, that the notice of removal must be filed within thirty days from "the service of summons upon the defendant" and its "receipt" of "the initial pleading" on which the action is based.[12] However, the second paragraph of section 1446(b) provides that, under the there stated circumstance, the starting date of the thirty day period within which the notice of removal must be filed shall be *later* than the date provided in the first paragraph. Thus, the second paragraph states that "[i]f the case stated by the initial pleading is not removable" then the thirty day period commences upon "receipt by the defendant, through service or otherwise, of a copy of an amended pleading, motion, order or other paper from which it may first be ascertained that the case is one which is or has become removable." It is wholly evident that the purpose of the second paragraph is to *extend* the time for filing notice of removal under the stated circumstance, and *not* to in any event *shorten* it to less than it would be under the first paragraph. The "except" clause, added to the end of the second paragraph in 1988 and applicable *only* to that paragraph, thus says in effect that the *extended* time for filing notice of removal provided for in the second paragraph is not available for removal on the basis of diversity if the case was commenced more than one year before the removal. Here, the defendants clearly filed their notice of removal within the time specified in the first paragraph of section 1446(b), so their removal notice was timely. They do not, and do not need to, invoke the second paragraph's extended filing period.[13]

11. This is likewise true in other removal contexts, e.g., diversity removal of an allegedly fraudulent Jones Act claim. *See, e.g., Fields v. Pool Offshore, Inc.*, 182 F.3d 353, 356–57 (5th Cir.1999); *Burchett v. Cargill*, 48 F.3d 173, 175–76 (5th Cir.1995).

12. The 30 day period in no event begins to run prior to service of process on the defendant. *See Murphy Bros. v. Michetti Pipe Stringing*, 526 U.S. 344, 119 S.Ct. 1322, 143 L.Ed.2d 448 (1999). If the defendant has been served with process, filing of the initial pleading in state court may constitute "receipt" of that pleading by defendant if the rules of the state court do not require service of that pleading. *See id.* at 1328–29.

13. Thus, the instant case differs from *Jernigan v. Ashland Oil Inc.*, 989 F.2d 812, 813–15 (5th Cir.1993). There the removing out-of-state defendant, Ashland Oil, was served with plaintiffs' petition on February 2, but did not file its notice of removal (which was based on fraudulent joinder of the in-state defendants) until March 30, more than three weeks after the expiration of the 30 day period provided by the first paragraph of § 1446(b). We held that Ashland Oil properly invoked the extended period for filing notice of removal provided by the second paragraph of § 1446(b) because it was not until March 23, when it received a copy of the answer of one of the fraudulently joined in-state (Louisiana) defendants, that Ashland Oil "could ... discover that none of the Louisiana corporations were proper defendants and that therefore diversity jurisdiction existed." *Id.* at 815. Ashland Oil's receipt of the copy of the co-defendant's answer was thus within § 1446(b)'s second paragraph's provision respecting receipt of an "other paper from which it may first be ascer-

Our analysis in this respect is fully consistent with the legislative history of the 1988 amendment and our opinion in *Deshotel*, 142 F.3d at 886–87. The there quoted legislative history reflects that the one year limit on diversity removal was established

> "as a means of reducing the opportunity for removal after substantial progress has been made in state court.... The amendment addresses problems that arise from a change of parties as an action progresses toward trial in state court. The elimination of parties may create for the first time a party alignment that supports diversity jurisdiction. Under Section 1446(b), removal is possible whenever this event occurs, so long as the change of parties was voluntary as to the plaintiff. Settlement with a diversity-destroying defendant on the eve of trial, for example, may permit the remaining defendants to remove. Removal late in the proceedings may result in substantial delay and disruption." *Id.* at 886.

Here, of course, there was no "substantial progress ... made in state court" prior to removal; indeed essentially nothing whatever was done in state court prior to removal, which was effected within thirty days after the first defendant was served or notified of the suit, and at no time prior to removal were any parties or claims removed from the suit. We likewise note

that the amended complaint includes all the defendants and all the claims included in the original complaint and that the damages allegations are essentially the same in the original and amended complaints.[14] Plaintiffs have never taken the position, here or below, that there is anything about the original complaint or the amended complaint which renders the amended complaint any *more* subject to removal by defendants than the original complaint or that anything that actually transpired since the filing of the original complaint rendered it (or the amended complaint) any *more* subject to removal by defendants than the original complaint was when first filed May 23, 1994. Plaintiffs have never claimed that *if* removal was proper when the notice of removal was filed February 4, 1998 it nevertheless would not have been proper (or available to defendants) if filed June 13, 1994.

We hold that the "except" clause concluding the second paragraph of section 1446(b) is inapplicable here and that the notice of removal was timely filed.

*Conspiracy*

■ Plaintiffs argue that their conspiracy claim against the in-state distributors demonstrates that the defendants were not fraudulently joined.

Plaintiffs' conspiracy allegations are entirely general.[15] Plaintiffs assert on ap-

tained that the case is one which is or has become removable." *See id.* at 815. Our opinion in *Jernigan* plainly indicates, contrary to the implicit premise of plaintiffs' argument, that fraudulent joinder removals are not *per se* within the second paragraph of § 1446(b).

14. The original complaint alleged that plaintiff Carrie Badon for approximately 40 years "smoked cigarettes manufactured and sold by defendants," that in May 1993 she "was diagnosed as having throat, larynx and vocal cord cancer," and that the "cancer was caused by her consumption of cigarettes." Actual damages in an unspecified amount were sought for "lost wages, past and future medical expenses and health care costs, physical and mental suffering, loss of enjoyment of life, and loss of consortium." "Exemplary damages"

in an unspecified amount were also sought. So far as here relevant, the damages allegations in the amended complaint were not materially different; no damages amounts were specified in the amended complaint. Nothing in the record suggests, and plaintiffs have never contended, here or below, that either original or the amended complaint alleged an insufficient amount in controversy for purposes of diversity jurisdiction; and we think it is plain that each was sufficient in this respect.

15. Plaintiffs rely, as they did below, on the allegations of paragraphs 19, 48 and 49 of the amended complaint, which, together with the amended complaint's introductory paragraph 18, read as follows:
   "18.

peal, as they did in their motion to remand below, that they "have alleged an agreement among *all* of the Defendants to manipulate nicotine in cigarettes with the intent to addict Carrie Badon to tobacco

products, thereby causing her to suffer great harm." Nowhere does the amended complaint allege any particular or specific activity, agreement, or state of mind on the part of either of the in-state distributor

As set forth more particularly below, the various defendants, over a long period of time and continuing into the present day, conspired to deceive the public about the addictive properties of nicotine and the full extent of the health risks of smoking. Through a well-organized campaign of fraud, lies, intimidation and deception, Defendants have avoided legal responsibility for engineering, manufacturing and selling the most deadly and harmful consumer product in history, while reaping billions of dollars in profits.

19.

In carrying out their conspiracy, the Defendants have committed numerous fraudulent and unlawful acts, including, but not limited to the following:

i. Publicly undertaking, as a 'paramount' special responsibility, the duty of researching and disclosing to public health authorities and the public at large the full extent of the health risks of cigarette smoking, but then suppressing, concealing, distorting, and lying about the state and extent of their true knowledge of those risks;

ii. Creating and/or funding fraudulent 'rump' or 'front' organizations, such as the Tobacco Industry Research Council (later known as the Council for Tobacco Research), which was held out to the public as an independent research organization, but which was in fact secretly controlled by lawyers and public relations firms, to prevent the public from learning what the Defendants knew about the health risks of smoking.

iii. Secretly destroying, concealing, and otherwise spoliating and shipping overseas incriminating evidence of industry testing and research on the health risks of cigarette smoking and the addictive nature of nicotine, shutting down laboratories on short notice and making personal threats against their own scientists who tried to publish research revealing what the industry actually knew about the risks of smoking, and asserting false claims of attorney-client privilege and attorney work product privilege in order to conceal their own damaging scientific research;

iv. Engaging in unfair and deceptive trade practices by, among other things, jointly sponsoring false, deceptive, and misleading advertising, promotional and public relations campaigns intended to confuse and create doubt among governmental entities and the public about the health risks of cigarette smoking;

v. Jointly and collectively making false, misleading, and sham representations to Congress, other governmental entities and the public regarding the health risks of cigarette smoking, the addictive nature of nicotine, and the manipulation of nicotine levels in cigarettes, in order to inundate congress and other federal and State entities with false and misleading information on the true risks of cigarette smoking, and with the intent to defraud, knowing that the Plaintiffs and others would reasonably rely on their representations;

vi. Conspiring to use monopoly power, and using that power to suppress research into the health effects of smoking and to halt research, development marketing and sales of so-called 'safer' cigarettes that caused less biological activity in smokers; and

vii. Engaging in unfair trade practices by targeting, marketing and advertising efforts to promote illegal sales of cigarettes to minors, and developing products and deceptive advertising campaigns.

. . .

48.

Each Defendant is sued individually as a primary violator and as a co-conspirator and aider and abettor, and the liability of each arises from the fact that each Defendant entered into an agreement with the other Defendants and third parties to pursue, and knowingly pursued, the common course of conduct to commit or participate in the commission of all or part of the unlawful acts, tortious acts, plans, schemes, transactions, and artifices to defraud alleged herein.

49.

Such acts of conspiracy and aiding and abetting included, among other things, falsely advertising, marketing, promoting and selling cigarettes as safe, non-addictive, and not containing levels of nicotine manipulated by Defendants to cause and maintain addiction."

defendants or by the "Tobacco Wholesalers," while as to the other defendants the amended complaint is replete with innumerable specific allegations of particular, identified activities, agreements, meetings and the like, as well as states of mind, by other named defendants, and also by groups of defendants (e.g., the "Tobacco Companies," the "Tobacco Consultants" and the "Tobacco Trade Associations") so defined in the amended complaint as *not* to include the in-state distributor defendants. While the amended complaint does often use the word "defendants," frequently it is evident that such usage could not be referring to the "Tobacco Wholesalers." [16]

The affidavits of the two in-state distributor defendants (see note 4, *supra*) completely negate their being a party to any conspiracy such as alleged in the amended complaint. Although plaintiffs replied to defendants' response to the motion to remand (which was accompanied by and relied on these affidavits) they have never tendered any summary judgment type (or other) evidence to either refute such affidavits or to support any of their allegations. Nor did plaintiffs ever request any delay in ruling on their motion to remand so they could produce or discover such (or other) evidence. Indeed, in plaintiffs' reply to the defendants' response to the motion to remand, plaintiffs never even mentioned their conspiracy claim or the affidavits filed by defendants. After the district court denied the motion to remand, plaintiffs never sought reconsideration.[17]

We agree with the district court that, considering defendants' affidavits "in light of the plaintiffs' lack of evidence," there is no reasonable basis for predicting that plaintiffs might establish liability in their conspiracy claim against the in-state defendants. *Fields*, 182 F.3d at 357; *Burden*, 60 F.3d at 217. As noted, our precedent establishes that "a removing party's claim of fraudulent joinder to destroy diversity is viewed as similar to a motion for summary judgment." *LeJeune*, 950 F.2d at 271. *See also, e.g., Fields*, 182 F.3d at 356 ("the district court is authorized 'to use a summary judgment-like procedure for disposing of fraudulent pleading claims'"); *Burchett*, 48 F.3d at 176 (same); *Keating*, 610 F.2d at 333 (remanding to determine "[b]y summary judgment or otherwise" whether joinder was fraudulent). While such a procedure requires that "all *disputed* questions of fact" be "resolved in favor of the nonremoving party," *Carriere*, 893 F.2d at 100 (emphasis added), "[a]s with a summary judgment motion, in determining diversity the mere assertion of 'metaphysical doubt as to the material facts' in insufficient to create an issue if there is no basis for those facts." *Jernigan*, 989 F.2d at 816 (footnote omitted, citing *Matsushita v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). So also as with a summary judgment motion:

> "[W]e resolve factual controversies in favor of the nonmoving party, but *only*

---

**16.** For example, paragraph 22 of the amended complaint alleges "Defendant manufacturers carefully calibrate, control and manipulate nicotine in cigarettes so that beginning smokers and others will become addicted to nicotine," while paragraph 205 alleges "defendants manipulate nicotine levels in their products so as to addict consumers," paragraph 206 alleges "the Tobacco Manufacturers and Trade Association Defendants actively concealed the addictive nature of nicotine, Defendants' manipulation of nicotine levels in Defendants' tobacco products, and Defendants' intent to addict Plaintiff," and paragraph 204 states:

"At all times during the course of dealing between the Tobacco Manufacturers and Trade Associations through advertising in the mass media and by other communications, Defendants repeatedly made the misrepresentation that nicotine is not addictive and not cancer-causing. Moreover, Defendants have recently stated that they do not manipulate nicotine levels in their tobacco products so as to addict consumers."

**17.** And, in their motion to certify, plaintiffs mentioned their timeliness and redhibition contentions, but said nothing respecting conspiracy.

when there is an actual controversy, that is, when *both* parties have submitted *evidence* of contradictory facts. *We do not, however, in the absence of any proof, assume that the nonmoving party could or would prove the necessary facts.*" *Little v. Liquid Air Corp.,* 37 F.3d 1069, 1075 (5th Cir.1994) (en banc) (first sentence emphasis added).

We hold that no error is shown in the district court's determination that the con-

spiracy claim asserted against the in-state distributors was fraudulent.

*Redhibition and Breach of Warranty*

The only remaining bases on which plaintiffs have urged, here or below, that they may impose liability on the in-state distributors under their pleadings are redhibition under La. Civ.Code arts. 2520 and 2524 and breach of implied warranty under arts. 2475 and 2524.[18]

---

**18.** There articles provide as follows:

"Art. 2475. Seller's obligations of delivery and warranty

The seller is bound to deliver the thing sold and to warrant to the buyer ownership and peaceful possession of, and the absence of hidden defects in, that thing. The seller also warrants that the thing sold is fit for its intended use."

"Art. 2520. Warranty against redhibitory defects

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price."

"Art. 2524. Thing fit for ordinary use

The thing sold must be reasonably fit for its ordinary use.

When the seller has reason to know the particular use the buyer intends for the thing, or the buyer's particular purpose for buying the thing, and that the buyer is relying on the seller's skill or judgment in selecting it, the thing sold must be fit for the buyer's intended use or for his particular purpose.

If the thing is not so fit, the buyer's rights are governed by the general rules of conventional obligations."

Other Civil Code articles cited in this connection by the parties include the following:

"Art. 2521. Defects that are made known to the buyer or that are apparent

The seller owes no warranty for defects in the thing that were known to the buyer at the time of the sale, or for defects that

should have been discovered by a reasonably prudent buyer of such things."

"Art. 2531. Liability of seller who knew not of the defect

A seller who did not know that the thing he sold had a defect is only bound to repair, remedy, or correct the defect. If he is unable or fails so to do, he is then bound to return the price to the buyer with interest from the time it was paid, and to reimburse him for the reasonable expenses occasioned by the sale, as well as those incurred for the preservation of the thing, less the credit to which the seller is entitled if the use made of the thing, or the fruits it has yielded, were of some value to the buyer.

A seller who is held liable for a redhibitory defect has an action against the manufacturer of the defective thing, if the defect existed at the time the thing was delivered by the manufacturer to the seller, for any loss the seller sustained because of the redhibition. Any contractual provision that attempts to limit, diminish or prevent such recovery by a seller against the manufacturer shall have no effect."

"Art. 2532. Return of the thing; destruction of the thing

A buyer who obtains rescission because of a redhibitory defect is bound to return the thing to the seller, for which purpose he must take care of the thing as a prudent administrator, but is not bound to deliver it back until all his claims, or judgments, arising from the defect are satisfied.

If the redhibitory defect has caused the destruction of the thing the loss is borne by the seller, and the buyer may bring his action even after the destruction has occurred.

If the thing is destroyed by a fortuitous event before the buyer gives the seller notice of the existence of a redhibitory defect that would have given rise to a rescission of the sale, the loss is borne by the buyer. ...."

"Art. 2545. Liability of seller who knows of the defect; presumption of knowledge

The asserted defects in the cigarettes which plaintiffs claimed to constitute redhibitory defects or breach of implied warranty are that smoking them causes cancer and is otherwise harmful to health and that they contain nicotine at levels which causes smoking them to become addictive. The district court held that there was no arguable claim for either the breach of implied warranty claim or for the redhibition claim, concluding that plaintiffs

> "do not allege the cigarettes at issue were unable or unfit to be used for their intended use—i.e., for the plaintiff Carrie Badon's personal smoking habit. Carrie Badon appears to have smoked cigarettes for many years without the type of functional failure that is characteristic of a breach of warranty reasonable fitness for intended use" or "of a redhibitory defect."

The district court distinguished the case of *Media Production Consultants, Inc. v. Mercedes–Benz of North America, Inc.*, 262 La. 80, 262 So.2d 377 (1972) (hereafter "*Media*"), in which the Louisiana Supreme Court held that a manufacturer, despite a lack of privity, was subject to liability to the ultimate consumer for breach of article 2475's "warranty of reasonable fitness for the product's intended use", and that the distributor not in privity with the consumer but who nevertheless, as was the case under the special facts there, "[i]nsofar as the American consumer is concerned . . . occupies the position of a manufacturer," "therefore" had the same "liability to the American consumer" as does "the manufacturer" of the defective product. *Id.* at 380.[19] The district court further determined that as "[t]he danger of smoking tobacco products are well known in the community . . . [t]herefore any alleged defects in the cigarettes were known to Carrie Badon, or should have been discovered by a reasonably prudent buyer, at the time that Carrie Badon purchased said cigarettes," and accordingly under article 2521 (see note 18 *supra*) such defects were not warranted against.

Because of our holdings rejecting plaintiffs' contentions respecting timeliness of removal and conspiracy, the issue determi-

**19.** The Louisiana Supreme Court stated:

> A seller who knows the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have, is liable to the buyer for the return of the price with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale and those incurred for the preservation of the thing, and also for damages and reasonable attorney fees. If the use made of the thing, or the fruits it might have yielded, were of some value to the buyer, such a seller may be allowed credit for such use or fruits.
>
> A seller is deemed to know that the thing he sells has a redhibitory defect when he is a manufacturer of that thing."

Article 2475 is contained in "Chapter 7. Of the Obligations of the Seller," and the other above quoted articles are contained in "Chapter 9. Redhibition," of "Title VII. Sale" of Book III of the Louisiana Civil Code.

Plaintiffs at oral argument in this court have again made plain that (apart from their conspiracy claim) they did not and do not seek to impose liability on the in-state defendants on the basis of tort or products liability.

> "Media [the plaintiff purchaser] asserts that MBNA [the distributor] occupies the position of manufacturer and, under sound legal theory, no privity of contract is required for a consumer to bring an action in warranty against a manufacturer of a defective product. . . .
>
> The maker of Media's vehicle is a foreign [German] corporation, not qualified to do business in the United States. In its distribution agreement, MBNA assumes the total responsibility for marketing the cars in the United States and for selling, servicing, and establishing franchise dealerships. Its name appears upon the Dealers Claims Policies and Procedures Manual, the owner's service policy, and the owner's automobile manual.
>
> It operates a vehicle distribution center and inspects, adjusts, and prepares the automobiles for placement in the hands of a dealer for retail sale.
>
> Insofar as the American consumer is concerned, MBNA occupies the position of manufacturer. We hold, therefore, that the liability of MBNA to the American consumer is that of the manufacturer of a defective vehicle." *Id.*

native of this appeal is whether under the circumstances of this case there is a reasonable basis for predicting that plaintiffs might establish redhibition or article 2475 implied warranty liability against the in-state distributor defendants. Plaintiffs do not claim to have purchased cigarettes from the in-state distributors. The other defendants (except for the parent of one of the cigarette manufacturers) are all alleged to be United States (namely, Virginia, New Jersey, Delaware or New York) corporations. Each of the other defendants was served with process either by service on a local agent for service, in the case of three of the cigarette manufacturers, or under the Louisiana "Long–Arm" statute. It is alleged that each of the manufacturing defendants "manufactures, advertises, promotes, markets and sells" its respective brands of cigarettes "throughout the United States, including Louisiana." As the district court noted, the uncontradicted affidavits of the in-state distributors (see note 4, *supra*) reflect, *inter alia*, that they:

"(1) . . . never purchased or blended tobacco for use in cigarettes; (2) . . . never designed, manufactured, packaged, or labeled cigarettes; (3) . . . never held themselves out to the public as manufacturers of cigarettes; (4) . . . never exercised or attempted to exercise any control or design or influence over any characteristics of the design, composition, or quality of cigarettes; (5) . . . purchased all of the cigarettes they have ever acquired in sealed packages, which packages were labeled and packaged by the cigarette manufacturers, then resold these cigarettes in the same sealed packages, without altering the contents of the packages whatsoever; (6) . . . never had any specialized or superior knowledge that was not available to the general public relating to nicotine levels in cigarettes, the alleged regulation or the alleged manipulation of nicotine lev-

els in cigarettes, or nicotine 'addition,' or the health risks alleged to be associated with smoking, and have never represented to any member of the general public that they, the Distributor Defendants, possess any such specialized or superior knowledge; and (7) . . . never made any representations concerning the health risks allegedly associated with smoking cigarettes, or the alleged 'addictive' nature of nicotine."

Three questions of Louisiana law appear to be present respecting the redhibition and article 2475 claims against the Louisiana distributors, as to none of which have we found any clear controlling precedents in the decisions of the Louisiana Supreme Court.

The first question is whether the alleged defect in cigarettes-namely that smoking them is addictive and seriously harmful to health-is a redhibitory defect or one warranted against under article 2475, despite the fact that the physical process of smoking the cigarettes is not functionally impaired and they function as intended by their manufacturers. We are aware of no Louisiana appellate court decisions addressing this issue or any clearly analogous to it. Federal district courts in Louisiana have divided on this issue. In addition to the decision below, Judge Trimble also concluded in *Lonkowski v. R.J. Reynolds Tobacco Co.*, No. 96–1192, 1996 WL 888182 (W.D.La. Dec.10, 1996) that this was not a redhibitory defect. A contrary conclusion was reached in *Scott v. The American Tobacco Co.*, 959 F.Supp. 340, 343–44 (E.D.La.1996) (Berrigan, J.). However, on remand of *Scott*, the Louisiana trial court sustained the distributors' exception of no cause of action. *See Scott v. American Tobacco Co.*, 709 So.2d 1018, 1019 (La.App. 4th Cir.1998).[20]

The next question is whether any action for redhibition or breach of implied war-

---

**20.** Ultimately the appeal of the plaintiffs was dismissed because the claims against other defendants remained pending in the trial court. *See Scott v. American Tobacco Co.*, No. 97–CA–1973, 1998 WL 802198 (La.App. 4th Cir. Nov.4, 1998).

ranty is barred because as a matter of law the dangers of smoking cigarettes were common knowledge and hence were either known to the plaintiff Carrie Badon or should have been discovered by a normally prudent buyer within the meaning of article 2521. Again, we are aware of no Louisiana appellate court decision resolving this or a closely analogous issue. *Lonkowski* and *Vickrey v. R.J. Reynolds Tobacco Co.,* No. 96–2612 (W.D.La. Apr.3, 1997) (Little, C.J.) hold that article 2521 precludes relief; *Scott* is to the contrary. This court has held, in a Texas products liability action, that "the dangers of cigarette smoking have long been known to the community. *See, e.g., Roysdon v. R.J. Reynolds Tobacco Co.,* 849 F.2d 230, 236 (6th Cir.1988) ... therefore, defendants had no duty to warn ... of the dangers of smoking." *Allgood v. R.J. Reynolds Tobacco Co.,* 80 F.3d 168, 172 (5th Cir.1996). In subsequent unpublished decisions we have applied *Allgood* to a Texas products liability case where nicotine addiction was allegedly caused by smoking, *Hulsey v. American Brands,* 139 F.3d 898 (Table), No. 97–40694 (5th Cir. Mar. 2, 1998), *affirming Hulsey v. American Brands,* No. C97–003, 1997 WL 271755 (S.D.Tex. Apr.7, 1997), and to a Louisiana Products Liability Act suit based on failure to warn of the dangers of "loose tobacco." *Hutchin v. American Tobacco Co.,* 116 F.3d 477 (Table), No. 96–31154 (5th Cir. Apr. 18, 1997) ("the health risks of smoking have long been common knowledge ... Given such, the appellees had no duty to warn of the dangers"). And in other Louisiana products liability suits against cigarette manufacturers federal district courts in Louisiana have made similar "common knowledge" holdings, as has also at least one Louisiana trial court. *See Todd v.*

*Brown & Williamson Tobacco Corp.,* 924 F.Supp. 59, 62 (W.L.La.1996) (Little J.) (loose tobacco to be rolled into cigarettes by consumer); *Christen v. R.J. Reynolds Tobacco Co.* (No. 1:96–2901, W.D.La, July 1, 1998) (Melancon, J.); *Washington v. Brown & Williamson Tobacco Corp, et al.,* No. 15,159 (20th Judicial District Court, West Feliciana Parish, Oct. 23, 1998) (Ramshur, J.) (sustaining no cause of action exception to suit against cigarette manufacturers for "failure to warn ... about the dangers of nicotine and manipulated nicotine levels"). *See also Ploch v. City of St. Louis,* 345 Mo. 1069, 138 S.W.2d 1020, 1023 (1940) ("The nicotine [in cigarettes] is harmful.... It is common knowledge that ... cigarette[s] tempt the young to indulgences which produce tobacco addicts").

On the other hand, in *American Tobacco Co. v. Grinnell,* 951 S.W.2d 420, 429 (Tex. 1997), the Texas Supreme Court held that although "the general health dangers attributable to cigarettes were commonly known as a matter of law by the community when Grinnell began smoking" in 1952, it could not "conclude, however, that the specific danger of nicotine addiction was common knowledge" at that particular time. *See also id.* at 430, noting that the Surgeon General's report declaring cigarette smoking addictive due to nicotine was published in 1988; *Rogers v. R.J. Reynolds Tobacco Co.,* 557 N.E.2d 1045, 1054 (Ind.Ct.App.1990) ("[t]here is no basis for our judicially noticing what the ordinary consumer's knowledge concerning the addictive qualities of cigarettes may have been ... in 1940.... It was not until 1988 that the Surgeon General published a report informing of the addictive nature of cigarettes").[21]

---

21. If 1988 is considered as the time at which the addictive nature of cigarettes became common knowledge, it may be arguable that all plaintiffs' claims prescribed prior to the initial filing of the suit in May 1994. We also observe in this connection that the in-state distributors' uncontradicted affidavits deny any knowledge of the alleged defects in ciga-

rettes beyond that reported in the public media and available to the general public. *See* La. Civ.Code article 2534, which provides in part:

"The action for redhibition against a seller who did not know of the existence of a defect in the thing sold prescribes in four years from the day delivery of such thing

Arguably relevant here is the decision in *Gilboy v. American Tobacco Co.*, 582 So.2d 1263 (La.1991), in which Gilboy brought a tort suit against cigarette manufacturers, prior to the effective date of the Louisiana Products Liability Act, for damages for lung and brain cancer allegedly caused by his smoking cigarettes, which had commenced in 1940 or 1941 when he was twelve or thirteen. He proceeded on the theory that cigarettes were unreasonably dangerous *per se* under the doctrine of *Halphen v. Johns–Manville Sales Corp.*, 484 So.2d 110 (La.1986). The trial court granted summary judgment for the defendants and the court of appeals affirmed. The Louisiana Supreme Court reversed and remanded, holding that whether cigarettes are unreasonably dangerous *per se* presented a factual issue inappropriate for summary judgment. *Gilboy* at 1264. The Court went on to state:

> "The lower courts concluded that Gilboy voluntarily assumed a known risk when he continued to smoke after being warned of the danger. However, if Gilboy knowingly assumed the risk of smoking after being warned of the consequences, there remains the factual issue of comparative fault (citations omitted).
>
> *Gilboy* allegedly became addicted to smoking at an early age when his judgment would not have been equal to that of a mature individual. His competence at the time: to recognize the danger; to appreciate the nature and extent of the risk; and to voluntarily expose himself to that risk are complicated factual issues.
>
> . . .

Warning consumers that a product is dangerous reduces but does not eliminate a manufacturer's responsibility for a product which is unreasonably dangerous per se. (citations omitted) The adequacy of a manufacturer's warnings is a factor in assessing comparative fault." *Id.* at 1265.

Plaintiffs argue that this language means that it is a fact question, and not a matter of judicial knowledge, whether the alleged defects in cigarettes "should have been discovered by a reasonably prudent buyer of such things" as stated in article 2521. It is not clear that plaintiffs are correct in this respect. *Gilboy* was not a redhibition or breach of implied warranty case. Moreover, the Supreme Court's quoted language seems to be entirely directed at "comparative fault," which assumes fault on each side. Moreover, as the opinion states, even a knowing assumption of risk would not wholly defeat *Halphen* recovery, but would only reduce it by the degree of comparative fault. By contrast, under article 2521 recovery in redhibition is apparently *wholly* defeated—regardless of comparative fault—if the defect is either known to the buyer or is one which should have been discovered by a reasonably prudent "buyer of such things." Moreover the last quoted words in article 2521 suggest a test to be applied to buyers of such things generally, not to the specific plaintiff, as the *Gilboy* court looked to for purposes of comparative fault. Consequently, we do not read *Gilboy* as resolving this issue.[22]

The remaining question presented respecting plaintiffs' redhibition and breach of implied warranty claims against the in-state distributors is whether these claims

---

was made to the buyer or one year from the day the defect was discovered by the buyer, whichever occurs first. . . .

The action for redhibition against a seller who knew, or is presumed to have known, of the existence of a defect in the thing sold prescribes in one year from the day the defect was discovered by the buyer.
. . . ."

22. We also note the passing remarks in *State v. Heidenhain*, 42 La. Ann. 483, 486, 7 So. 621, 622 (1890), that for "those who have acquired the habit" cigarette smoking is "almost indispensable" and in *Lionel's Cigar Store v. McFarland*, 162 La. 956, 973, 111 So. 341, 347 (1927), referring to cigarette smokers as "[t]he addicted or habituated users."

are plainly meritless because the distributors are not manufacturers of the cigarettes and Badon did not purchase the cigarettes from the distributors but rather from the retailers to whom the distributors had sold them. The only decision of the Louisiana Supreme Court which appears to address the issue of privity in this respect is *Media*. See note 19 and accompanying test, *supra*. It is not entirely evident to us that *Media* clearly resolves the issue. We initially note that although *Media* apparently involved only a breach of implied warranty action under article 2475, the Louisiana Supreme Court has construed it as also governing redhibition claims. *Rey v. Cuccia*, 298 So.2d 840, 842, 845 (La.1974) (Tate, J.). *See also Datamatic v. International Bus. Mach. Corp.*, 795 F.2d 458, 462–64 (5th Cir.1986) (Rubin, J.); *Smith v. Max Thieme Chevrolet Co.*, 315 So.2d 82, 86 (La.App. 2d Cir.1975) (Dennis, J.). We likewise treat *Media* as fully applicable to redhibition as well as article 2475 claims. That leaves two theoretically possible questions concerning the application of *Media* here. First, whether it entirely obviates any privity requirement for such actions, or only eliminates that requirement as to a defendant who is either the manufacturer of the product or a distributor thereof who in some special sense "[i]nsofar as the ... consumer is concerned ... occupies the position of manufacturer." And, second, *if* the latter is the correct reading of *Media*, whether the distributors here could be said to occupy the position of manufacturer, in the sense that the distributor in *Media* did.

As to the latter inquiry, we hold that the distributors here did not occupy a position, so far as concerns consumers, analogous to that of the distributor in *Media*. There the manufacturer was "a foreign [German] corporation not qualified to do business in the United States;" here the manufacturer defendants are all United States corpora-

tions, three with permits to do business in Louisiana and all served with process and made parties hereto. In *Media* the sole distributor had "the total responsibility for marketing in the United States;" here the allegations of the complaint and amended complaint make clear that that is not the case as to the in-state distributors, even respecting Louisiana. In *Media*, the distributor's name appeared on the owner's service policy and on the owner's manual and it "prepares the automobiles for placement;" here, the distributors merely distribute the cigarettes in the original sealed and labeled packages in which they are received. *See, e.g., Arnold v. Fremin*, 538 So.2d 624 (La.App. 1st Cir.1988).[23]

This, then, leaves the question of whether *Media* totally eliminated any privity requirement in redhibition and article 2475 claims even as against those who were not, and did not occupy the position of, manufacturers of the product. We conclude that the facially most plausible reading of *Media* is that it does *not* hold that privity is not required in redhibition or article 2475 actions against a defendant who is not, and does not occupy the position of, the product's manufacturer. Only this reading accounts for the court's discussion of the facts demonstrating that the distributor there "[i]nsofar as the American consumer is concerned ... occupies the position of manufacturer." If the distributor would have been liable anyway that discussion would be wholly unnecessary. Moreover, it is clear that the "occupies the position of manufacturer" conclusion is the predicate for the imposition of liability, because the next sentence says "[w]e hold, *therefore*, that the liability of MBNA [the distributor] to the American consumer is that of the manufacturer" (emphasis added). The inference is that the ordinary distributor has no such liability absent privity. This approach is consistent with the Court's previous recitation of the argu-

---

**23.** Nor do the distributors hold themselves out as manufacturers or specify standards of manufacture or the like.

ment of the consumer-plaintiff there, which it ultimately accepts, viz:

> "Media asserts that MBNA [the distributor] occupies the position of manufacturer and, under sound legal theory, no privity of contract is required for a consumer to bring an action in warranty against a manufacturer of a defective product...." *Id.* at 380.[24]

However, Louisiana Court of Appeals decisions appear to be divided as to whether *Media* dispenses with any privity requirement in all redhibition and article 2475 actions or dispenses with privity only as to suits against the manufacturer of the defective product or a party occupying the position of manufacturer so far as concerns the ultimate purchaser. *See, e.g., Grimaldi Construction Inc. v. J.P. & Sons Contractors,* 686 So.2d 935, 940 (La.App. 5th Cir.1996) (*Media* totally dispenses with privity); *Arnold* (*Media* limited to defendants who are either manufacturers or occupy the position of manufacturers). Similarly divided are the decisions of the United States District Courts in Louisiana. *See Scott, supra* (*Media* totally dispenses with privity); *Morgan v. United States Tobacco Co. Inc. et al.,* No. 97–0280 (W.D.La. Apr. 17, 1997) (Little, C.J.) ("When a distributor occupies the position of a manufacturer as far as the consumer is concerned, but only then, Louisiana courts have found that distributor liable for breach of implied warranty," citing

*Media,* and "our examination of Louisiana law forces us to conclude that a state-law action based on an alleged breach of the implied warranties, of fitness and against redhibitory defects, cannot be maintained against a distributor that did not sell to the plaintiff, and does not stand in the shoes of the manufacturer"); *In re Gas Water Heater Products Liability Litigation,* No. 96–2484, 1996 WL 732525 (E.D.La. Dec.12, 1996) (Duval, J.) (same).

The viability of plaintiffs' redhibition and article 2475 claims against the Louisiana distributors depends on an answer favorable to plaintiffs to each of the following questions of Louisiana law as applied to the circumstances of this case, namely: whether the fact that smoking cigarettes has seriously adverse health effects and is addictive constitutes a redhibitive defect in the cigarettes or a defect warranted against under 2475; whether there is such judicially known common knowledge of the adverse effects of cigarette smoking as to preclude such redhibition and article 2475 claims; and whether the lack of privity between the Louisiana distributors and plaintiff Badon precludes her redhibition and article 2475 claims against them where they were not, and did not occupy the position of, manufacturers of the cigarettes. It appears to us that there are no clear controlling precedents in the deci-

---

24. We acknowledge that there is subsequent broader language in *Media* arguably suggesting a total irrelevance of privity. Thus, later in that opinion the Court says:

> "Louisiana has aligned itself with the consumer-protection rule, by allowing a consumer without privity to recover, whether the suit be strictly in tort or upon implied warranty. *Marine Ins. Co. v. Strecker* [234 La. 522, 100 So.2d 493 (1958)], *supra; LeBlanc v. Louisiana Coca Cola Bottling Co.,* 221 La. 919, 60 So.2d 873 (1952)." *Id.* at 381.

However, we conclude that this language must be understood, in light of what has gone before, to refer to plaintiff's lack of privity with the manufacturer or the party who created the defect. That analysis is supported by the cases cited. The *Strecker* case was a neg-

ligence suit by a tenant of a building against a contractor "to recover damages caused to him by the fall of a cabinet installed by the contractor for the owner," it being alleged "that the cabinet fell as a result of the defendant's negligence 'in failing to properly install and secure the wall cabinet' ...". *Id.,* 100 So.2d at 494. In *LeBlanc* a party who consumed a Coca Cola containing a housefly brought suit "against Louisiana Coca Cola Bottling Company, the manufacturer and distributor of the beverage." *Id.,* 60 So.2d at 873–74. The Coca Cola had been purchased by a friend of the plaintiff's from a retail grocery. *Id.* at 876. The Court there noted that "a case of this sort is, in its essence, grounded upon the manufacturer's failure to comply with the warranty of wholesomeness." *Id.* at 875.

sions of the Louisiana Supreme Court with respect to these questions.

Whether plaintiffs' redhibition and article 2475 claims against the Louisiana distributors have any possible validity is determinative of this appeal and, as the foregoing discussion reflects, ultimately depends on principles of Louisiana law as to which it appears to us that there are no clear controlling precedents in the decisions of the Louisiana Supreme Court. We accordingly have decided to certify the relevant legal question to the Supreme Court of Louisiana, as follows:

CERTIFICATE FROM THE UNITED STATES COURT OF APPEALS FOR THE FIFTH CIRCUIT TO THE SUPREME COURT OF LOUISIANA, PURSUANT TO RULE XII OF THE RULES OF THE LOUISIANA SUPREME COURT

TO THE SUPREME COURT OF LOUISIANA AND THE HONORABLE JUSTICES THEREOF

The style of the case, a statement of facts showing the nature of the cause and the circumstances out of which the questions or propositions of law arise are as stated in the foregoing portions of this opinion.

### QUESTION CERTIFIED

The question certified is as follows:

Does a consumer of cigarettes, who, without actual knowledge of their addictiveness or of all their health risks, purchased them at retail and smoked them from about age sixteen in 1953 until 1993, and, as a result, became addicted to them, suffered cancer diagnosed in 1993, and filed suit within a year thereafter, state with respect to such purchases a claim for either redhibition or for breach of warranty under article 2475, on the basis of the fact that smoking cigarettes is addictive and seriously harmful to health, as against the wholesale distributors of those cigarettes with whom the consumer was not in privity

and who did not manufacture, or occupy as to the consumer the position of manufacturer of, the cigarettes, or hold themselves out as such, who sold the cigarettes only in the unaltered original sealed and labeled containers received from the manufacturers, who made no representations respecting whether smoking presented health risks or was addictive, and who neither had nor claimed any greater knowledge concerning the asserted defects in the cigarettes than that available to members of the general public through the public media?

### Conclusion

This Court disclaims any intention that the Supreme Court of Louisiana confine its reply to the precise form or scope of the legal question that we certify.

It appears to this court that the question certified is one as to which there are no clear controlling precedents in the decisions of the Supreme Court of Louisiana. If the Supreme Court of Louisiana accepts this certificate, the answers provided by that court will determine the resolution of the instant appeal.

We transfer to the Supreme Court of Louisiana with this certification the record on appeal and the appellate briefs and related documents of this case.

This panel retains cognizance of the appeal in this case pending response from the Supreme Court of Louisiana, and the Court hereby CERTIFIES the question posed above.

### QUESTION CERTIFIED